UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KARSEM WILLIAMS,                                          :

                Petitioner,                          :

          -against-                             :            04 Civ. 4653 (DAB) (AJP)

WILLIAM PHILLIPS, Superintendent,             :      **REPORT AND RECOMMENDATION**
Green Haven Correctional Facility,

                          :

            Respondent.                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Chief Magistrate Judge:**

**To the Honorable Deborah A. Batts, United States District Judge:**

        Pro se petitioner Karsem Williams seeks a writ of habeas corpus from his
September 7, 1995 conviction in Supreme Court, New York County, of two counts of second degree
murder and one count each of first degree robbery and second degree criminal possession of a
weapon, and sentence (as modified) to twenty-five years to life imprisonment. (Dkt. No. 4: Am. Pet.
¶¶ 1-5.) Williams' habeas petition claims that: (1) he was deprived of due process by the prosecutor's
failure to disclose compensation paid to a key prosecution witness for his testimony (Am. Pet. Att.
1 ¶ 1); (2) he was deprived of due process when the prosecutor failed to disclose a key witness'
psychiatric history (id. ¶ 2); (3) he was denied a fair trial by the prosecutor's failure to disclose a key
prosecution witness' criminal history (id. ¶ 3); (4) the prosecutor violated his "constitutional duty to

alert the defense and court when one of his witnesses give false testimony" (id. ¶ 4); and (5) he was "subjected to an ineffective assistance of counsel" by counsel's failure to request certain hearings (id. ¶ 5).

For the reasons set forth below, Williams' petition should be DENIED as time-barred.

## FACTS

### Pre-trial Motions

Prior to trial, the prosecutor told defense counsel that Abdullah Craft, Williams' uncle and a main prosecution witness, had a violation conviction. (Dkt. Nos. 14-15: Trial Transcript ["Tr."] 218-19.) However, the prosecutor did not disclose the arrest record containing the underlying details of the conviction. (Id.) During trial, defense counsel asked the court to require the prosecutor to turn over this information, arguing:

> [The prosecutor] informs me orally that Abdullah [C]raft was found guilty of a violation, he refuses to turn over the print sheet which would reflect the date, the time and the crime for which he was originally arrested as well as possibly a docket number which could be used – which could have been used in advance of trial for me to get the papers, so that I could have questioned him about the underlying facts of his arrest which I would be entitled to do. I don't know what he was arrested for. I've only been given information that he was only convicted of a violation and not a crime.

(Tr. 219-20.)

The prosecutor responded: "It's my knowledge that I have an obligation to turn over to [defense counsel] convictions of crimes. I went beyond my obligation when I told [defense counsel] that one of the witnesses had been arrested." (Tr. 221.)

The judge denied the motion, telling Williams' counsel that "on the basis of the knowledge you now have, in good faith, you can cross-examine since it goes to the issue of credibility.  You can cross-examine any of these witnesses on the area of their arrest and convictions."  (Tr. 222.)

## The Prosecution's Case at Trial:  Overview

On December 5, 1993, the body of New York City Department of Corrections Officer Anthony Villages was found wrapped in a rug and bound with cable on Lenox Avenue in upper Manhattan. (Leslie: Tr. 230-31, 235.) During the subsequent investigation, police detectives learned that shortly before his death, Villages had told a friend, Rachel Orange, that he was going to meet with a man he met on a train earlier that day named "Dayquan." (Orange: Tr. 186-87.)  Before leaving to meet "Dayquan," Villages gave Orange a piece of paper with the address of an apartment near the park where Villages' body was found as well as a telephone number associated with the apartment.  (Orange: Tr. 189.)

Detectives determined that the apartment belonged to the mother of Williams' daughter.  (Leslie: Tr. 249-50.)  While executing a search warrant at the apartment, police found carpet fibers matching the rug wrapped around Villages' body and wire similar to that used to bind the rug.  (Leslie: Tr. 243-44, 246, 248.)  They also found three photographs of Williams with the word "Dayquan" written on the back, and Williams' birth certificate.  (Leslie: Tr. 244-46, 248-49, 275-76.)

Six months later, on May 14, 1994, Williams' uncle Abdullah Craft told police that Williams had evaded police by staying in Craft's apartment, and that during his stay, Williams confessed to killing Villages. (Craft: Tr. 404-06.) Later that day, police arrested Williams and charged him with robbing and murdering Villages. (Court: Tr. 584-87.)

At trial, the prosecution presented three witnesses who heard Williams confess to killing Villages. Both Craft and his common-law wife Anita Pearson testified that while Williams stayed in their apartment, he repeatedly discussed the killing in graphic detail. (Craft: Tr. 385-88; Pearson: Tr. 494, 502-05.) Kim Beverly, a neighbor with whom Williams had sexual relations, presented similar testimony. (Beverly: Tr. 540-43, 548, 571.)

### Direct Examination of Abdullah Craft

During his direct examination, the prosecutor questioned Craft about his disciplinary record during his service in the Vietnam War:

Q: And can you tell the jury about the circumstances around which you were court marshalled; what were you charged with and what happened?

A: Well, you know, after I was serving in the bush after several months, there come periods of time when you get paranoid or whatever like that and we had loss a lot of men on one occasion. And you tend to have someone you look up to, what they call a mother or platoon. They kind of support you. And we loss them. I was kind of depressed about that and other little things. And one day I decided I wasn't ready to go back out and I refused to go back out. I was charged with disobeying a direct order.

(Craft: Tr. 367.) Craft testified that after his court-marshal, he served a sentence of four months hard labor in Vietnam and at a naval base in New Hampshire. (Craft: Tr. 368-69.) Craft also testified that

on another occasion he was charged with being AWOL for not returning to his unit on time. (Craft: Tr. 369.)

The prosecutor next asked Craft the first of many questions about his history of mental illness and drug abuse: Craft stated he was first institutionalized after a suicide attempt in 1986 when he was a cocaine addict and was diagnosed with major depression. (Craft: Tr. 373-74.) Craft testified that his drug and alcohol use continued through 1993, when he moved to the Brooklyn apartment where Williams stayed after the murder:

> Q:    And would it be fair to say that while you were [at the Brooklyn address] you had a heavy crack addiction?
>
> A:    Yes.
>
> Q.    You smoke[d] a lot of crack, smoked it frequently?
>
> A:    I smoked the pipe frequently, not everyday, but enough.
>
> Q:    And did you also drink at that time?
>
> A:    Sure I drank beer. Every time I had money to buy beer, I would drink beer.

(Craft: Tr. 381-82.)

Craft testified that in December 1993, his brother Hassan told him that Williams "had a body" and needed to hide in his apartment. (Id. at 382-83.) During his stay, Williams described to Craft his role in the Villages murder:

> Q:    And in the course of his stay with you and his visit with you at Morgan Avenue did he tell you why he needed to stay at your house?

A:    Yeah, he told me.  I got all the details over a period of time, not necessarily in the sequence that things happen.

Q:    What did he tell you?

A:    Well, he had told me he had shot a corrections officer.

Q:    And did he give you any details as to how that took place?

A:    Well, from what he told me was that he had met the officer on the train.  I don't know whether he was by himself or not because he never said so.  And the officer was taken back to [Williams' girlfriend's] apartment.
. . .
And the officer got – and got in the apartment from what I understand and they, you know – he was sitting at the table and he was fidgeting like he was reaching for something, so he says, and made him a little edgy and he fired a shot in the back of his head.

Q:    Who fired a shot?

A:    Karsem [Williams].

(Craft: Tr. 386-87.)

After Craft related detailed statements made by Williams and Williams' friend Eric White[1] describing the sequence of events leading to Villages death and the disposal of his body, the prosecutor again returned to the issue of Craft's drug use and mental health:

Q:    During [March 1994], would you deceive people to get crack?

A:    Yes I would.  There was times, basically times I asked for money, I did what I was supposed to do with it.  Still boils back to crack because I originally had

---

[1]    Although Eric White was not tried alongside Williams and did not testify at trial, the court permitted Craft's hearsay testimony about White's statements regarding the murder on the grounds that White and Williams were co-conspirators in the robbery.  (Tr. 407-09, 436-37.)

the money, should have taken care of it so it was still just asking for money for crack.

Q:      And would you say that crack was dominating your life at that point?

A:      Definitely.  Without a doubt.

Q:      Now can you tell the jury about how you took your, attempted to take your own life?  First of all one or two attempts?

A:      There were two attempts.
        . . .
Q:      What did you do?

A:      I cut myself but I didn't cut myself as bad as I knew I could.  The second time I was in a very deep episode and you know, I was all for it.  I was prepared to go.  I opened my arms up really bad, lost a lot of blood.  But its hard to explain but its like not facing the situation but that is what it came to.

(Craft: Tr. 399-400.)  Craft testified that his second suicide attempt resulted in part from a rumor that

Williams "went to bed with [Craft's] common law wife."  (Craft: Tr. 400.)

        After Craft returned from the hospital following the second suicide attempt, Williams

and Craft's brother Hassan confronted Craft about his drug addiction.  (Id. at 402.)

A:      . . . [Karsem] asked me what did I do with some groceries his mother gave me when I came out of the hospital.

Q:      Who asked you that?

A:      Karsem asked me that.  You know they had me pissed off.  I was telling them anything.  How much crack do you smoke?  Five hundred dollars a week. What did you do with the groceries.  Some of them was canned goods, some was food they cooked already.

        I said I stood on the corner and I sold the bag of groceries I told them. When I said that, both of them came at me at one time.  Next thing I knew I

> was down on the floor. They kicked and stomped me till they bruised my ribs and dislocated my jaw.

(Id. at 403-04.)

The next morning, Craft went to the police station to press assault charges against Williams and Hassan. (Craft: Tr. 405.) While at the police station, Craft told the police about Williams' role in Villages' murder.[2] (Id.) Craft explained that he made the decision to turn Williams in "[b]ecause I was pissed off. I was mad and yes I wanted revenge." (Craft: Tr. 406.)

Thereafter, the District Attorney's office moved Craft to an undisclosed out-of-state location. (Craft: Tr. 413.) Craft testified that between the period when Craft told the police about Williams' involvement in the murder and the trial, the District Attorney's office gave him money for living expenses:

> Q:     And in the course of your being relocated by my office, did you receive money?
>
> A:     Yes I did.
>
> Q:     And what was that money for?
>
> A:     Living expenses and lodging.
>
> Q:     And have you received money continuously from May of last year up until today?

---

[2]     Although Craft testified that he told the police only about Williams' and White's involvement in the robbery and murder, he signed a statement that also implicated his brother Hassan. (Craft: Tr. 410-11.) Craft testified that the statement was prepared in error and signed under duress, and that he retracted that portion of the statement shortly after he signed it. (Craft: Tr. 411-12.)

> A:    No because after a period of time I obtained a job and while I was working getting money, making my own money there was no need for me to ask you for my money for living.
>
> Q:    But you have received rent money and some money for food; would that be fair to say?
>
> A:    Yep.
>
> Q:    That was paid for by my office?
>
> A:    That's correct.

(Craft: Tr. 413-14.)

Also during direct examination, Craft acknowledged an ongoing struggle with mental health problems. He testified that the Saturday before his testimony, he had some "kind of like a depressive episode" and checked into a hospital. (Craft: Tr. 431.) He remained there through the day of his testimony because he "fel[t] depressed, stressed out, nervous" and the hospital staff considered him a suicide risk. (Craft: Tr. 432.) Craft testified that he was prescribed two psychotropic medications which he took both the night before and the morning of his testimony. (Craft: Tr. 432-34.)

The prosecutor also asked Craft if he knew of Tamika Powell, the woman who phone records indicated had a conversation with someone inside the apartment where Villages was murdered (Preede: Tr. 722-23, 726-30):

> Q:    . . . Mr. Craft, do you know a woman by the name of Tamika Powell?
>
> A:    It's a friend of Karsem's mother, my sister, which is Karsem mother's family.

Q:      Say again.

A:      She's a friend of the family.

Q:      Of whose family?

A:      Mrs. Williams' family.

(Craft: Tr. 429-30.)

**Defense Counsel's Cross-Examination of Abdullah Craft**

On cross-examination, Williams' attorney focused on Craft's mental health, criminal record, and the payments he received from the District Attorney's office.

When asked in more detail about the payments from the District Attorney's Office, Craft testified that between the time of Williams' arrest and the trial seven months later, the District Attorney had paid him "over $3,000" for food and rent. (Craft: Tr. 438.) Craft acknowledged that he was unsupervised while staying out-of-state and that he received the payments in cash. (Craft: Tr. 438-40.)

Defense counsel asked Craft about two other charges levied against him while in Vietnam for resisting arrest and threatening a military police officer. (Craft: Tr. 445-46.) The prosecutor unsuccessfully objected to the questions on the ground that Craft was acquitted of both charges. (Tr. 445.) Williams' counsel never asked Craft about the basis of the misdemeanor conviction that the prosecutor refused to disclose at the pre-trial hearing. (See page 2 above.)

Williams' counsel also questioned Craft extensively on the details of his drug use and mental health. Craft again testified that he drank large quantities of beer, sometimes drinking an

entire six pack while smoking either marijuana or crack three to four days a week. (Craft: Tr. 446-47.) Craft admitted that his heavy drug use "may have played a role in intensifying [his] depression." (Craft: Tr. 454.) Craft also admitted that when using crack, he "[w]ould lie. Normal behavior [for] a crack addict." (Craft: Tr. 460-61.)

## The Verdict and Sentence

On July 13, 1995, the jury convicted Williams of two counts of second degree murder, one count of first degree robbery, and one count of second degree criminal possession of a weapon. (Tr. 1002-05; see Dkt. No. 4: Am. Pet. ¶ 5.) On September 7, 1995, the court sentenced Williams as a second violent felony offender to consecutive terms of imprisonment totaling forty-five years to life. (Dkt. No. 15: 9/7/95 Sentencing Tr. 2-4, 25; see Am. Pet. ¶¶ 3-4.)

## Williams' Direct Appeal

Williams appealed his conviction to the First Department on seven grounds, claiming that: (1) During their search of the apartment where Villages was murdered, the police recovered items not included in the warrant and not in plain view, which should have been suppressed (Dkt. No. 12: State Appx. Ex. A: Williams 1st Dep't Br. at 18-29); (2) Craft's testimony about Eric White's statements constituted impermissible hearsay (id. at 30-36); (3) the trial court improperly ruled that the prosecution could impeach Williams using his prior conviction, thus preventing him from testifying on his own behalf (id. at 37-43); (4) Williams was deprived of his confrontation clause rights when the trial court refused to require the prosecutor to disclose the arrest record underlying Craft's disorderly conduct conviction (id. at 44-48); (5) the prosecution improperly shifted the burden

of proof by calling attention to Williams' failure to testify on his own behalf (id. at 49-54); (6) the trial court failed to order certain testimony read back despite a clear request by the jury (id. at 55-59); and (7) Williams was improperly sentenced to consecutive rather than concurrent terms of imprisonment (id. at 60-65).

On June 30, 1998, the First Department affirmed Williams' conviction, finding the trial court's evidentiary rulings proper and Williams' claims meritless, but modified Williams' sentence to concurrent terms of imprisonment because each offense was committed through a single act. People v. Williams, 251 A.D.2d 266, 266-67, 676 N.Y.S.2d 49, 50-51 (1st Dep't 1998).

On December 7, 1998, the New York Court of Appeals denied Williams leave to appeal. People v. Williams, 92 N.Y.2d 1040, 684 N.Y.S.2d 506 (1998).

## Williams' C.P.L. § 440.10 Motion

In August 2001, Williams filed a Motion to Vacate Judgment pursuant to C.P.L. § 440, claiming that he had newly discovered evidence that cast doubt on Abdullah Craft's testimony. (Dkt. No. 12: State Appx. Ex D: Williams C.P.L. § 440 Motion & Affs.)

First, Williams claimed that the new evidence showed that the District Attorney had paid Craft a previously undisclosed sum of $10,000 for his testimony. (Williams C.P.L. § 440 Aff. at p. 4.) Second, Williams claimed that new evidence showed Craft had a history of violence and psychiatric illness. (Id. at 5.) Finally, Williams claimed he had evidence proving Craft testified falsely when he stated Tamika Powell was a close friend of the Williams family. (Id. at 6.) Williams

also claimed his trial counsel was ineffective (although he did not explain the basis for that claim). (Id. at 7-8.)

In support of these allegations, Williams attached affidavits from six family members. (See Williams C.P.L. § 440 Motion Exs. A-F.) Two of the affiants, Craft's estranged wife and Craft's daughter, stated that Craft had boasted of receiving $10,000 from the District Attorney in return for his testimony. (Williams C.P.L. § 440 Motion Ex. A: Sabrina Craft Aff.; id. Ex. B: Roquiah Craft Aff.)

Other family members related Craft's struggles with mental illness and drug abuse. (See Williams C.P.L. § 440 Motion Exs. C, D, F.) Craft's sister recounted Craft's history of medical treatment for mental problems and stated that Craft "is known to mislead, deceive, and manipulate people at will . . . [and] suffers from a long history of illegal narcotics abuse." (Williams C.P.L. § 440 Motion Ex. C: Brenda Smith Aff.) A second sister stated that Craft abused his daughter and threatened his common law wife. (Williams C.P.L. § 440 Motion Ex. E: Aischa Craft Aff.) Craft's brother provided an affidavit in which he noted that Craft was:

> [A] [V]ietnam veteran suffering from post war unstableness, who was frequently imprisoned during war time[;] . . . has a long history of psychiatric placements . . . ; has attempted to commit suicide too many times for me to recount; . . . [has] unprovoked violent outbursts[;] . . . abuses his prescription medication . . .[and] had an arrest record that attests to his abnormal and irrational behavior.

(Williams C.P.L. § 440 Motion Ex. D: Sa-id Craft Aff.)

Two of the family members stated that Tamika Powell was unknown to the Williams family. (Williams C.P.L. § 440 Motion Ex. E: Aischa Craft Aff.; id. Ex. F: Zainab Ali Aff.)

On November 27, 2002, the § 440 court denied Williams' motion. <u>People</u> v. <u>Williams</u>, No. 4729-94 (State Appx. Ex. G: 11/27/02 Decision & Order.) Noting that C.P.L. § 440 motions must be made "'with due diligence after the discovery of such alleged new evidence,'" the § 440 court reviewed each claim and determined that the proffered evidence was easily available to Williams at trial. (<u>Id</u>. at 4.) First, regarding Craft's psychiatric history, the court held:

> The People state that Craft's psychiatric records had been provided to the defense prior to trial, after the People voluntarily submitted them to the trial court for in camera review. The record is clear that Craft was both examined and cross-examined about his psychiatric history. Hence, this evidence cannot be said to be newly discovered.

<u>Id</u>. at 4 (citations omitted). The § 440 court reached the same conclusion on Williams' claim that Craft's criminal history was not properly disclosed, stating that "a simple reading of records belies [the claim that the People failed to reveal Craft's criminal history] and shows that at trial Craft was examined and cross-examined about the very criminal history defendant now claims is newly discovered." (<u>Id</u>. at 5.)

Considering Williams' argument that Craft testified falsely about the family's relation to Tamika Powell, the § 440 court noted that Powell's existence and the phone evidence linking Powell to the apartment was known to the defense prior to trial and "all the defendant had to do was ask family members to testify with respect to their relationship to Tamika Powell, or their lack of any such relationship. Again this is not newly discovered evidence." (<u>Id</u>. at 5.)

Next, the § 440 court considered Williams' accusation that the prosecutor had paid Craft $10,000 for his testimony:

> The Court finds that the allegations of fact set forth in defendant's motion in support of his claim fail to comport with the procedural requirements of section 440.30 of the Criminal Procedure Law. The grounds upon which defendant alleges that Craft was paid for his testimony comes in the form of conclusory hearsay allegations contained in affidavits from the defendant's family. Indeed, the alleged basis of the witnesses knowledge is unclear nor is it clear when they gained this knowledge. Moreover, there is no affidavit from Craft stating that he was paid for his testimony, nor do any of the affiants allege that they witnessed these alleged payments. In light of defendant's failure to provide sworn, non-hearsay, allegations of fact, as required, the motion is denied without a hearing.

(Id. at 7.)

Finally, the court denied Williams' ineffective assistance of counsel claim, holding that "[a]lthough sufficient facts were clearly on the record to permit review of defendant's allegations, he unjustifiably failed to raise his ineffective assistance of counsel in his direct appeal. Accordingly, the instant motion must be, and is, denied pursuant to CPL 440.10(2)(c)." (Id. at 8.)

On January 14, 2003, Williams sought leave to appeal to the First Department (State Appx. Ex. H), and on April 3, 2003, the First Department denied leave to appeal the C.P.L. § 440 decision. (Am. Pet. ¶ 12(b).)

**Williams' Initial Federal Habeas Petition**

In his initial federal habeas petition, dated March 29, 2004 and received by the Court's Pro Se Office on April 12, 2004, Williams challenged his conviction on eight separate grounds, combining claims from both his direct appeal and his C.P.L. § 440 motion. (Dkt. No. 1: Pet. at 4.) Chief Judge Mukasey directed Williams to show cause why his petition was not time-barred since the petition was filed four years after his direct appeal. (Dkt. No. 2: 6/22/04 Order at 3, 5.) The

order also advised Williams any "amended petition will completely replace the petition he originally filed with the Court." (Id. at 5.)

In an affirmation filed in response to Judge Mukasey's order, Williams acknowledged he was barred from petitioning for habeas relief on the grounds of his direct appeal and stated that his petition was based only on the new evidence claims in his C.P.L. § 440 motion. (Dkt. No 3: Williams 8/13/04 Aff. at 1-2.)[3/]

**Williams' Instant Amended Habeas Petition**

Williams' amended habeas petition raises only the five grounds raised in his C.P.L. § 440 motion, concerning evidence he deemed newly discovered: (1) he was deprived of due process by the prosecutor's failure to disclose compensation paid to a key prosecution witness, Craft, for his

---

[3/]    Williams nonetheless requested the court allow him to "consolidate this writ of habeas corpus with the constitutional grounds of [his] direct appeal" (id. at 2), stating:

> I was unable to bring a writ under my direct appeal in a timely fashion due to the publicity of my case which resulted in two assaults on me and numerous unwarranted cell searches where majority of my legal documents were either destroyed or taken from my cell by authorities in each cell search of my living quarters. These cell searches were never legally documented by authorities which is the procedure in any cell search. However be these incidents not being legally documented, there were no documentations to support my claim of my legal documents being taken other than the several correspondences of my lawyer and I, whereas he tried to replace such missing legal documents. By the time I finally received copies of these documents the statute of limitations on a federal habeas corpus had expired.

(Id. at 1-2.)  In a subsequent affidavit, he conceded that he was only pursuing the "new evidence" claims, not the claims originally raised on direct appeal.  (Dkt. No. 16: 7/14/05 Williams Aff. at 2.)

testimony (Dkt. No. 4: Am. Pet. Att. 1 ¶ 1); (2) he was deprived of due process when the prosecutor failed to disclose Craft's psychiatric history (id. ¶ 2); (3) he was denied a fair trial by the prosecutor's failure to disclose Craft's criminal history (id. ¶ 3); (4) the prosecutor violated his "constitutional duty to alert the defense and court when one of his witnesses [Craft] gave false testimony" about Tamika Powell (id. ¶ 4); and (5) he was "subjected to an ineffective assistance of counsel" by counsel's failure to request certain hearings (id. ¶ 5).

## ANALYSIS

## I.    WILIAMS' HABEAS PETITION IS UNTIMELY UNDER § 2244(d)(1)(A)

The Antiterrorism and Effective Death Penalty Act ("AEDPA") contains a one-year statute of limitations for habeas corpus petitions:

(d)(1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

. . . .; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

On December 7, 1998, the New York Court of Appeals denied Williams leave to appeal. People v. Williams, 92 N.Y.2d 1040, 684 N.Y.S.2d 506 (1998). The AEDPA one-year limitations period began running ninety days later, on March 8, 1999, when Williams' time to file a petition for certiorari expired. See, e.g., Williams v. Artuz, 237 F.3d 147, 150-51 & n.1 (2d Cir.) ("We . . . hold that the AEDPA limitations period specified in Section 2244(d)(1)(A) does not begin to run until the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – the time to seek direct review via certiorari has expired."), cert. denied, 534 U.S. 924, 122 S. Ct. 279 (2001).[4/] Thus, Williams' time to file his habeas petition expired on March 8, 2000, four years before he actually filed for federal habeas relief.

Williams is not entitled to a toll of the AEDPA limitations period, since his C.P.L. § 440 motion was not filed until August 2001, more than a year after expiration of his AEDPA time

---

[4/]      Accord, e.g., Pratt v. Greiner, No. 01-2460, 2002 WL 31285784 at *5 & n.1 (2d Cir. Oct. 4, 2002); Brown v. Artuz, 283 F.3d 492, 497 n.1 (2d Cir. 2002); Matias v. Artuz, No. 00-2203, 8 Fed. Appx. 9, 10, 2001 WL 300543 at *1 (2d Cir. Mar. 27, 2001), cert. denied, 122 S. Ct. 93 (2001); Wheeler v. Artuz, No. 00-2250, 6 Fed. Appx. 57, 57, 2001 WL 253093 at *1 (2d Cir. Mar. 13, 2001); Rosario v. Bennett, 01 Civ. 7142, 2002 WL 31852827 at *13 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.); Martin v. Walker, 02 Civ. 5880, 2002 WL 31509876 at *1 & n.1 (S.D.N.Y. Nov. 12, 2002) (Peck, M.J.); King v. Greiner, 02 Civ. 5810, 2002 WL 31453976 at *1 (S.D.N.Y. Nov. 5, 2002) (Peck, M.J.), report & rec. adopted, 2003 WL 57307 (S.D.N.Y. Jan. 7, 2003) (Cote, D.J.); Gomez v. Duncan, 02 Civ. 0846, 2002 WL 1424584 at *3 (S.D.N.Y. July 1, 2002) (Peck, M.J.); Simpson v. Portuondo, 01 Civ. 1379, 2001 WL 830946 at *5 (S.D.N.Y. July 12, 2001) (Peck, M.J.); Bonilla v. Ricks, 00 Civ. 79225, 2001 WL 253605 at *2 (S.D.N.Y. Mar. 14, 2001) (Peck, M.J.); Shaw v. Mazzuca, 00 Civ. 6941, 2001 WL 66404 at *2 (S.D.N.Y. Jan. 26, 2001) (Peck, M.J.); 28 U.S.C. § 2244(d)(1)(A).

limitation. The Second Circuit has made clear that the state collateral attack toll of § 2244(d)(2) does not start the one-year limitation period to run anew, especially when it has alrady expired before the collateral motion. E.g., Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir.), cert. denied, 531 U.S. 840, 121 S. Ct. 104 (2000); accord, e.g., Martinez v. Keane, 02 Civ. 9030, 2003 WL 21254422 at *1 (S.D.N.Y. May 30, 2003) (Peck, M.J.); Rosario v. Bennett, 01 Civ. 7142, 2002 WL 31852827 at *13 & n.16 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2003 WL 151988 (S.D.N.Y. Jan. 21, 2003) (Berman, D.J.).

## II. WILLIAMS DOES NOT SATISFY THE "NEWLY DISCOVERED EVIDENCE" LEGAL STANDARD, AND THUS IS NOT ENTITLED TO HABEAS RELIEF

Williams' habeas petition is based on claims of "newly discovered evidence." (See pages 16-17 above.) Thus, this Court must consider the applicability of 28 U.S.C. § 2244(d)(1)(D) to determine whether Williams' habeas petition is timely under the separate test of one-year from the date the factual predicate of Williams' claims could have been discovered through the exercise of due diligence. This Court cannot consider the merits of Williams' claim if the petition is time barred. See, e.g., Burnie v. Duncan, No. 99-CV-350, 2003 WL 22670913 at *3 (E.D.N.Y. Nov. 3, 2003).[5]

---

[5] See also, e.g., Yekimoff v. NewYork State Div. of Parole, 02 Civ. 8710, 2004 WL 2211661 at *1-2 (S.D.N.Y. Oct. 4, 2004) (Dismissing habeas claims solely as time-barred, noting that "the Court need not reach the merits of those claims."); Duran v. United States, 94 CR. 300, 00 Civ. 407, 2002 WL 867864 at *3 (S.D.N.Y. May 3, 2002) ("This Court is precluded from addressing the merits of [petitioner's] . . . claim because his petition is untimely under the one-year statute of limitations imposed by the AEDPA."); Parke v. United States, No. 97-CV-526, 1998 WL 326762 at *2 (N.D.N.Y. Apr. 27, 1998) ("[T]he court need not address the merits of petitioner's claim because the court concludes that the [§ 2255] motion is untimely."), aff'd, No. 01-2213, 25 Fed. Appx. 72 (2d Cir. 2002), cert. denied, 531 U.S. 902, 123 S. Ct. 224.

The "newly discovered evidence" AEDPA limitations period "runs from the date a petitioner is on notice of the facts which would support a claim, not from the date on which the petitioner has in his possession evidence to support his claim." <u>Youngblood</u> v. <u>Greiner</u>, 97 Civ. 3289, 1998 WL 720681 at *4 n.4 (S.D.N.Y. Oct. 13, 1998)**;** <u>see also</u>, <u>e.g.</u>, <u>Flanagan</u> v. <u>Johnson</u>, 154 F.3d 196, 198-99 (5th Cir. 1998) (Petitioner's factual predicate that he did not know he had the right not to testify was established when he first executed an affidavit setting forth the legal and factual basis for his claim; "Section 2244(d)(1)(D) does not convey a statutory right to an extended delay, in this case more than seven years, while a habeas petitioner gathers every possible scrap of evidence that might . . . support his claim."); <u>Martino</u> v. <u>Berbary</u>, No. 03-CV-0923, 2005 WL 724133 at *7 (W.D.N.Y. Mar. 30, 2005) (Petitioner's "newly discovered evidence" claim is untimely because it "had clearly been in existence and could have been discovered by petitioner prior to the date that his conviction became final."); <u>Cobos</u> v. <u>Skinner</u>, No. 04-CV-0083, 2004 WL 2191582 at *4 (W.D.N.Y. Sept. 26, 2004) (Alleged "newly discovered evidence" "was clearly in existence and could have been obtained by petitioner before and during his trial."); <u>Foy</u> v. <u>Sabourin</u>, 02 Civ. 7094, 2004 WL 574655 at *3-4 (S.D.N.Y. Mar. 23, 2004) (Denying petitioner's "newly discovered evidence" claim because the factual predicate came out during trial.); <u>McKinney</u> v. <u>Herbert</u>, No. 02-CV-4299, 03-MISC-0066, 95-CV-3129, 2003 WL 2318872 at *2 (E.D.N.Y. Dec. 3, 2003) (Weinstein, D.J.); <u>Small</u> v. <u>Miller</u>, 03 Civ. 240, 2003 WL 22801332 at *3 (S.D.N.Y. Nov. 25, 2003) (Petitioner's "newly discovered evidence" claim held time-barred where petitioner waited over one year from when he "discovered the factual predicate" to file his motion to vacate.); <u>Burnie</u> v. <u>Duncan</u>, 2003 WL 22670913 at *4

("Burnie's petition is out-of-time because at the evidentiary hearing in state court it was shown that he had knowledge of [the factual predicate]. . . . Burnie knew of [the witness'] purportedly exculpatory testimony as early as 1991, when he was tried in state court. Thus, the claim is time-barred, and I need not reach the merits of the claim."); Zephir v. Portuondo, No. 98-CV-7647, 2003 WL 21738601 at *2 (E.D.N.Y. July 24, 2003) (Agreeing with the state court that the records were not "newly discovered evidence" because they "were readily available to [petitioner] prior to trial. Moreover, [petitioner] obtained the records significantly before the one-year period expired."); Adams v. Greiner, 272 F. Supp. 2d 269, 273-74 (S.D.N.Y. 2003) ("Because the factual predicate for Adams's claim accordingly could have been discovered prior to the date on which his judgment of conviction became final, the exception provided by § 2244(d)(1)(D) is unavailable.") (citing cases); Aponte v. Artuz, 01 Civ. 6404, 2002 WL 1205742 at *3 (S.D.N.Y. Mar. 11, 2002) (rejecting defendant's "newly discovered evidence" claim because he did not raise it until "881 days after this (new evidence) was discovered, and 391 days after the Appellate Division's order was entered."); Lucidore v. New York Div. of Parole, 99 Civ. 2936, 1999 WL 566362 at *5 (S.D.N.Y. Aug. 3, 1999) (Peck, M.J.), aff'd, No. 99-2492, 209 F.3d 107 (2d Cir. 2000), cert denied, 531 U.S. 873, 121 S. Ct. 175; DeVeaux v. Schriver, 98 Civ. 7563, 1999 WL 1216298 at *5 (S.D.N.Y. Apr. 29, 1999) (Peck, M.J.), report & rec. adopted, 1999 WL 1095580 (S.D.N.Y. Dec. 3, 1999) (Mukasey, D.J.); Tineo v. Strack, No. CV 98-834, 1998 WL 938950 at *3 (E.D.N.Y. Nov. 12, 1998) (petitioner's "newly discovered evidence" period began to run at trial when petitioner first knew that the "the videotape

was not . . . accurately transcribed," not when he had the videotape re-transcribed eight years after his conviction).

"The case law is clear that the one-year statute of limitations governing federal habeas corpus relief begins to run from the date on which the facts supporting the claim or claims presented could have been discovered 'through the exercise of due diligence . . . regardless of whether petitioner actually discovers the relevant facts at a later date.'" Adams v. Greiner, 272 F. Supp. 2d at 273-74 (quoting Wims v. United States, 225 F.3d 186, 188 (2d Cir. 2000)); see, e.g., Rodriguez v. New York, 01 Civ. 9374, 2003 WL 289598 at *12 (S.D.N.Y. Feb. 11, 2003) (Peck, M.J.); Duamutef v. Mazzuca, 01 Civ. 2553, 2002 WL 413812 at *9 (S.D.N.Y. Mar. 15, 2002) ("When evidence is newly obtained, but could have been obtained earlier [through the exercise of due diligence], the date when the evidence was actually obtained has no effect on the AEDPA limitation period."); see also cases cited above. Put another way, "[t]ime begins when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance. If § 2244(d)(1) used a subjective rather than an objective standard, then there would be no effective time limit. . . ." Owens v. Boyd, 235 F.3d 356, 359 (7th Cir. 2000), quoted with approval by Adams v. Greiner, 272 F. Supp. 2d at 274. "[N]ewly discovered evidence is, by definition, incapable of discovery through . . . due diligence before or during trial. Evidence in existence at an earlier date, though perhaps unknown to a petitioner, cannot later be described as newly discovered." Hector v. Greiner, No. 99 CV 7863, 2000 WL 1240010 at *1 (E.D.N.Y. Aug. 29, 2000) (citations omitted).

As the § 440 court held, the evidence Williams claims to have newly discovered was available to him at the time of trial.  (See page 14 above.)  Further, the § 440 court found that the evidence of Craft's psychiatric and criminal history, as well as the issue of Tamika Powell's existence, were not new evidence, as the trial transcript makes clear that Williams was aware of these facts at the time of trial, and his counsel extensively cross-examined Craft on his psychiatric and criminal history.  (See pages 10-11 above.)  Additionally, the § 440 court noted that Williams knew at trial that Craft had received over $3,000 in relocation expenses from the District Attorney's Office, even if he did not know the amount (allegedly) was $10,000.  (See page 15 above.)  "At best, [the additional information] would have afforded defense counsel additional grounds on which to impeach prosecution witnesses whose credibility had already been vigorously challenged. . . ." United States v. Canova, No. 03-1291(L), 03-1300, 2005 WL 1444147 at *13 (2d Cir. Jun. 21, 2005).[6/]  This Court agrees with the state court that the evidence was not newly discovered.[7/]

---

[6/] Pursuant to 28 U.S.C. § 2254(e)(1), the factual findings of the § 440 court are entitled to AEDPA deference and this Court presumes them to be correct unless petitioner can prove otherwise by clear and convincing evidence.  28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); see, e.g., Cotto v. Herbert, 331 F.3d 217, 233 (2d Cir. 2003) ("Under 28 U.S.C. § 2254(e)(1), the fact-findings of the trial court are subject to a 'presumption of correctness . . .'").

[7/] The Supreme Court has held that "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact."  Herrera v. Collins, 506 U.S. 390, 400, 113 S. Ct. 853, 860 (1993) ("[N]ewly discovered evidence . . . must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief

## CONCLUSION

For the reasons set forth above, Williams' federal habeas petition should be denied as barred by the AEDPA's statute of limitations. A certificate of appealability should not be issued.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to my chambers, 500 Pearl Street, Room 1370. Any

---

on federal habeas corpus." Herrera v. Collins, 506 U.S. at 400, 113 S. Ct. at 860 (quoting Townsend v. Sain, 372 U.S. 293, 317, 83 S. Ct. 745, 759 (1963)).

This Court notes that, as a matter of law, it is not clear that Williams' purported "newly discovered evidence" even presents a federal constitutional argument. Williams' simply argues that this newly discovered evidence casts doubt on the accuracy of the jury's verdict. He does not articulate how such an argument raises a federal claim, other than vague references to denial of a fair trial or deprivation of due process. See, e.g., Newton v. Coombe, 95 Civ. 9437, 2001 WL 799846 at *10 (S.D.N.Y. July 13, 2001); Townes v. Lacy, 99 Civ. 9635, 2001 WL 682452 at *3 (S.D.N.Y. June 18, 2001) (holding a post-conviction affidavit asserting petitioner's innocence does not "constitute a factual predicate for a new constitutional claim. Moreover, evidence of [petitioner's] innocence . . . cannot serve as an independent basis for habeas relief."); Edwards v. United States, No. 05 CV 0017, 2005 WL 1522743 at *3-4 (E.D.N.Y. June 27, 2005) ("Even assuming that [affiant] is now willing to testify that [prosecution witnesses] told him that they intended to perjuriously implicate petitioner at his trial, it would be insufficient to justify vacating petitioner's conviction or his sentence" absent cognizable constitutional error.); Thompson v. Fisher, No. 02-CV-0526, 03-MISC-0066, 2003 WL 23198787 at *20-21 (E.D.N.Y. Oct. 31, 2003) (Weinstein, D.J.) (petitioner's claim of actual innocence, supported by an affidavit calling a key prosecution witness's testimony into question, did not present a constitutional issue for federal habeas review).

requests for an extension of time for filing objections must be directed to Judge Batts. Failure to file

objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474

U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d

Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d

Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct.

825 (1992); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek

v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d

Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED:     New York, New York
              August 2, 2005

                                        **Andrew J. Peck**
                                        United States Chief Magistrate Judge


Copies to:    Karsem Williams
                Melissa B. Marrus, Esq.
                Judge Deborah A. Batts